UNION OFFSET, A Corporation, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Union Offset v. Commissioner
Docket No. 7492-74.
United States Tax Court
T.C. Memo 1977-47; 1977 Tax Ct. Memo LEXIS 398; 36 T.C.M. (CCH) 202; T.C.M. (RIA) 770047; February 23, 1977, Filed G.M. Anderson, for the petitioner. V.R. Balmes, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined the following deficiencies in petitioner's Federal income tax: Taxable Year Ended
Deficiency
September 30, 1968
$11,427.08
September 30, 1969
12,273.78
September 30, 1970
13,954.14
September 30, 1971
11,717.55
The only issue to be decided is whether petitioner was availed of for the purpose of avoiding Federal income tax with respect to its sole shareholder by permitting earnings and profits to accumulate instead of being distributed to such shareholder, and is thus liable for the accumulated earnings tax imposed by section 531. [1]
*400 FINDINGS OF FACT
Some of the facts have been stipulated and are found accordingly. Petitioner, Union Offset, is a California corporation, and, at the time the petition was filed, had its principal place of business in San Francisco, California. Petitioner was incorporated under the laws of the State of California on May 7, 1963. Morris Krantz was petitioner's founder, sole shareholder, president and chairman of its Board of Directors. Prior to May 8, 1963, Mr. Krantz operated a printing and litography business (hereinafter "printing business") as a sole proprietorship in San Francisco. On May 8, 1963, Mr. Krantz transferred to petitioner the assets and liabilities of his printing business in exchange for 100 percent of petitioner's stock. Petitioner operated the printing business as its sole activity from May 8, 1963 through September 30, 1964. On October 1, 1964, petitioner sold a 25 percent interest in the printing business to Irving Hochman. On the same day, petitioner and Mr. Hochman formed a partnership which adopted the name Union Offset (hereinafter "partnership"). Petitioner contributed its 75 percent interest and Mr. Hochman contributed his 25 percent interest *401 in the printing business to the partnership. The partnership operated the printing business from October 1, 1964 through December 31, 1971. Petitioner, as managing partner, made all day to day and policy decisions. Mr. Krantz was employed by the partnership, and, in his capacity as an employee of the partnership, he handled accounts, quoted prices, took care of customers, handled personnel problems, and signed junior contracts. Mr. Krantz received the following salary and bonus from the partnership for each of the calendar years 1967 through 1971: Year
Salaries and Bonuses
1967
$42,000
1968
41,500
1969
45,000
1970
45,000
1971
56,000
Sometime in 1965, petitioner's president, Mr. Krantz, decided to diversify petitioner's business operations by investing petitioner's accumulated earnings in real estate.The real estate diversification plan envisioned the acquisition of commercial real estate in the San Francisco area that "offered potential for appreciation" and "made sense economically." Although no monetary parameters were specified in the plan, one of the brokers aiding petitioner to locate suitable property assumed petitioner was looking for real *402 estate that would require a minimum down payment of $100,000. Following the decision to diversify its operations, petitioner continued to accumulate earnings rather than distributing them as dividends to its sole shareholder. To implement the plan, Mr. Krantz began investigating real estate investment opportunities for petitioner. His investigations continued sporadically during the years in issue. In October 1965, petitioner considered purchasing the Hyatt Chalet Motel in Oakland, California. The proposed acquisition involved a 5-year purchase-leaseback arrangement in which the lessee would operate the motel. Petitioner's officers rejected the proposed acquisition because it would not be able to actively operate the motel until after the expration of five years. Thereafter petitioner made few efforts to locate or acquire real estate until 1968. At the time petitioner began working with several real estate brokers in the San Francisco area.In May 1968, petitioner investigated and considered purchasing an office building in Santa Rosa, California for $330,000. The principal tenant in the building was the State Compensation Insurance Fund, which held a 10-year lease. During *403 fiscal 1968, petitioner also considered purchasing a warehouse in Oakland, an office building in San Francisco, a Goodyear tire store in Stockton, a store in San Luis Obispo, and a Firestone recapping plant in Sunnyvale. All of these properties were subject to existing long-term net leases which required the lessess to pay taxes, insurance, and maintenance. In August 1968, Mr. Krantz learned that the Yerba Buena Redevelopment Agency planned to acquire the land and building at 768 Mission Street which the partnership had been leasing for its printing business. Petitioner realized it would be necessary to seek new quarters to house the partnership's printing business. Petitioner sought to relocate the printing business in the same general area since many of its customers were in that area and because the area afforded easy access to transportation facilities. Mr. Krantz was authorized by petitioner on August 28, 1968, to investigate a new location for the partnership through lease or purchase. Mr. Krantz initially attempted to lease housing for the partnership. He changed his focus, however, when he discovered that suitable rental space was scarce and expensive due to the great *404 number of displaced businesses looking for new quarters. As a result, petitioner decided to purchase rather than lease. At this time, Mr. Krantz was unable to estimate the amount of money that such a purchase would require. Subsequently, on July 1, 1969, petitioner purchased a four-story building at 1167 Mission Street in San Francisco for $190,000 ($50,000 down payment and $140,000 mortgage). At the time of purchase, the building was occupied by one tenant. Following the purchase petitioner renegotiated the tenant's lease, whereby the tenant agreed to vacate the most desirable floor (the fourth floor) of the building. Subsequently, pursuant to an oral lease, petitioner rented the vacated floor of the building to the partnership for the period from June 15, 1970 through 1975. The rengotiated lease with the holdover tenant provided that petitioner was responsible only for maintenance of the exterior walls, roof, and waterpipes. Subsequent to the purchase, petitioner made improvements in the building for the purpose of readying the fourth floor for occupation by the printing business. The redevelopment agency paid for a portion of the costs of moving the printing business and *405 of preparing the fourth floor for the partnership. While the purchase of the Mission Street building was being negotiated, petitioner also continued its efforts toward acquiring other real property. In December 1968, petitioner made an offer of $400,000 on a building and 5.5 acres of undeveloped property in Concord, California. The structure housed the offices of El Dorado Electronics Company which held a 15-year net lease on the building. Petitioner and the seller, however, were unable to come to terms on the 5.5 acre tract. Mr. Krantz also considered purchasing an office building in Fremont during fiscal 1969. This building was subject to a 10-year lease held by the Alameda County Welfare Department. This building and the buildings investigated in fiscal 1968 were rejected because they did not offer management activities for the purchaser-lessor and because the rental income generated did not justify the asking price. In March 1970, Mr. Krantz began investigating the Penn Mutual Life Insurance Building in Oakland, California. This building housed several tenants who held leases with terms ranging from 2 to 10 years. The asking price for the building was $592,000. In *406 April 1971, petitioner offered to purchase the building for $500,000. The offer, however, was rejected and the seller made a counter-offer to sell for $555,000, including a down payment of $195,000. Petitioner rejected the counter-offer and no further activities with respect to this property were undertaken. In mid-1970, petitioner also considered purchasing two medical buildings in San Francisco, but rejected each seller's proposal in March 1971. Thereafter in June 1971 petitioner considered purchasing a 12-story high rise apartment building in San Francisco. However, after investigating the proposal, petitioner determined that the asking price of $495,000 was too high and that the units were too small. In July 1971, petitioner made an offer of $365,000, inculding down payment of $137,000, toward the purchase of a 21-unit apartment complex in Menlo Park, California.The seller rejected the offer, and petitioner did not take any further action after discovering that the property might be condemned in order to provide a right-of-way for a freeway.In addition, Mr. Krantz considered purchasing an 81-unit apartment complex in Fremont, California in August 1971. Petitioner, however, *407 rejected the proposed purchase because the acquisition would not have been a "good investment." Sometime around the close of its 1971 fiscal year petitioner had considered and rejected the proposed purchase of an office-warehouse building in South San Francisco. The asking price of the building was $372,690. In October 1971, petitioner considered the purchase of two related parcels in Santa Rosa, California. The first parcel included the Crocker Citizens Bank office building and the second a department store and satellite buildings. In November 1971, the corporation made an offer to purchase the Crocker Citizens Bank building for $825,000, including a down payment of $75,000 plus prepaid interest of $75,000. Negotiations on this purchase continued through November, and on December 3, 1971, petitioner offered to purchase both parcels for $1,478,600. However, petitioner abandoned negotiations shortly thereafter upon discovery that the bank building had suffered earthquake damage. At some point in November 1971, respondent initiated an audit of petitioner's 1968 return to determine whether petitioner was liable for the accumulated earnings tax. Petitioner's accountant was informed *408 of the audit in November or December 1971. Thereafter, in January 1972, petitioner made an offer to purchase the Benson office building in Oakland, California for $750,000, including a down payment of $250,000. This offer was subsequently withdrawn following the discovery that the principal tenant in the building was moving to another building. Petitioner's investigations finally culminated in the purchase of the Park Plaza office building in Fremont, California in July 1972. The purchase price of the building was $990,000, including a $250,000 down payment. Following the purchase of this building, petitioner refurbished it. Petitioner hired decorators, painters, and other workers in his effort to upgrade the property. Petitioner also contracted for the repair of a portion of the roof of the building. Petitioner's president renegotiated several of the leases of the building's 20 tenants and located new tenants (except in one instance). He also collected rents and handled emergency repairs. Since its formation, petitioner has paid no dividends. From October 1, 1964 to September 30, 1971, petitioner paid no salaries or wages, and, during the years in issue, petitioner *409 did not have its own telephone listing. Petitioner's income, expenses and federal income tax for the years in issue are as follows: Taxable Years Ended
9/30/68
9/30/69
9/30/70
9/30/71
Partnership income
$59,075
$66,269
$86,633
$58,968
Dividends
2,774
3,826
3,568
3,131
Capital gain
17,420
1,626
-0-
5,056
Interest
5,080
5,874
10,050
10,934
Net rental income
-0-
(1,397)
(12,152)
777
Total
$84,349
$76,198
$88,099
$78,866
Other deductions
per return
7,246
10,562
10,542
9,334
Taxable income
$77,103
$65,636
$77,557
$69,532
Taxes paid
28,856
27,095
32,264
25,940
Net income after
taxes
$48,247
$38,541
$45,293
$43,592
During the calendar years 1968 through 1971, Mr. Krantz's taxable income, tax liability and marginal tax rate per his returns were as follows: [3]
1968
1969
1970
1971
Taxable income per return
$36,251.27
$42,033.55
$41,642.00
$56,741.00
Tax reported per return
11,237.05
14,427.71
13,251.00
20,430.00
Marginal rate
45%
48%
48%
53%
At the close of its fiscal year *410 ending September 30, 1967, petitioner's retained earnings were $159,821.29 and its net working capital was $182,276.08. [4] Petitioner's current assets and liabilities for the years in issue were as follows: 9/30/68
9/30/69
9/30/70
9/30/71
Current Assets
Cash
$180,493.62
$107,969.07
$109,130.18
$181,570.58
Accounts Receivable
5,429.59
3,788.52
410.30
185.30
Investments & Securities [5]
61,859.93
113,541.04
165,574.55
149,507.09
Loans to Shareholders
-
-
-
5,000.00
Other Current Assets
-
-
-
2,519.52
Total Current Assets
$247,783.14
$225,298.63
$275,115.03
$338,782.49
Current Liabilities
Current Taxes Payable
$28,855.91
$22,094.57
$23,625.78
$26,744.26
Notes Payable within
1 Year
6,000.00
Mortgage Payments
Due Within 12
Months [6]
None
17,400.00
17,400.00
17,400.00
Total Current Liabilities
$28,855.91
$39,494.57
$41,025.78
$50,144.26
Ratio of Current Assets to Current Liabilities
8.5-1
5.7-1
6.7-1
6.7-1
Net Working Capital
$218,927.23
$185,204.06
$234,089.25
$288,638.23
Retained Earnings
$209,427.98
$250,230.57
$297,493.85
$344,882.50
*411 Petitioner's long-term liabilities for the years in issue were as follows: 9/30/68
-0-
9/30/69
$ 88,651.24
50,000.00 [7]
$138,651.24
9/30/70
$82,773.47
50,000.00
$132,773.47
9/30/71
$120,965.99
Respondent, in accordance with section 534(b), notified petitioner that he intended to issue a notice of deficiency for the years in issue. Petitioner, in accordance with section 534(c), sent respondent a statement setting forth the grounds upon which it relied to establish that its retained earnings were not permitted to accumulate beyond the reasonable needs of its businesses. On July 10, 1974, respondent issued a statutory notice of deficiency in which he determined that petitioner was liable for tax under section 531 for the years in issue. OPINION The sole issue is whether petitioner is liable for the accumulated earnings tax for the years in issue. *412 Section 531 imposes an accumulated earnings tax on every corporation formed or availed of for the purpose of avoiding the income tax with respect to its shareholders by permitting earnings and profits to accumulate instead of being distributed. The question of whether a corporation was formed or availed of for such a purpose is one of fact ( Helvering v. NationalGrocery Co.,304 U.S. 282 (1938); Bremerton Sun Publishing Co.,44 T.C. 566, 582 (1965)), and the existence of accumulations beyond the reasonable needs of the business establishes a presumption that such a purpose exists. Section 533(a). The reasonable needs of a business include the reasonably anticipated needs of the business (section 537(a)(1)), and the business of a corporation includes "in general, any line of business it may undertake." Section 1.537-3(a), Income Tax Regs.
Though normally the burden of proof in tax cases is on the taxpayer, section 534 prescribes that one component of this burden may be shifted to respondent in certain situations. Under section 534(c), if petitioner submits a statement setting forth the grounds (together with facts sufficient to show *413 the basis thereof) upon which it relies to justify the accumulation of earnings and profits, then the burden of proving that earnings and profits have accumulated beyond the reasonable needs of the business shifts to respondent. In this case, respondent sent petitioner a notification in accordance with section 534(b), and petitioner submitted a timely statement under section 534(c), setting forth grounds and supporting facts which it claims were sufficient to justify the accumulation of earnings during the years in issue. In its 534(c) statement, and later at trial, [7] petitioner argued that the accumulation of earnings was justified during each of the years in issue because of the reasonably anticipated needs of its business. In support of this assertion petitioner stated that at the end of fiscal 1968 it was necessary to accumulate earnings to finance the purchase of a building to house its printing business. Petitioner further stated that at the end of fiscal 1968, 1969, 1970 and 1971 it was necessary to accumulate earnings to finance the purchase of real estate in conjunction with its diversification plan. *414 Respondent asserts the section 534(c) statement fails to set forth grounds sufficient to justify the accumulation of earnings and does not contain facts sufficient to support its grounds and, as a consequence, it is ineffective in partially shifting the burden of proof to respondent. We need not decide whether petitioner's statement is adequate to shift the burden of proof because, irrespective of where the burden of proof lies, we are of the opinion that the evidence establishes that the accumulations of earnings in fiscal 1968, 1969, 1970 and 1971 were beyond the reasonably anticipated needs of petitioner's business. On the merits, petitioner first contends that it needed to accumulate its earnings for the fiscal year 1968 for the reasonable needs of the partnership. Petitioner nowhere contends that the partnership, which ran a successful printing business, needed operating capital. Its need which the petitioner agreed to provide was for a new building in which to locate its business. At the beginning of its 1968 fiscal year petitioner had retained earnings of $159,821.29 and net working capital of $182,276.08. In August 1968, petitioner's president learned that the *415 building which housed the partnership printing business was to be acquired by the Yerba Buena Redevelopment Agency and that it would be necessary to relocate that business. To protect its interest in the partnership, petitioner committed itself to provide housing for the partnership in the same general area in which the business was located. Petitioner also authorized Mr. Krantz to locate a suitable structure to house the partnership and either to purchase or lease any property he located. Other businesses located within the area to be acquired by the Yerba Buena Redevelopment Agency were also seeking new business locations.As a result the rental real estate market was unsettled, with rental property being scarce and, where available, expensive. Petitioner therefore decided to acquire suitable housing by purchase. Mr. Krantz estimated that it would cost "a lot" to relocate and as a consequence decided to accumulate earnings to finance such a purchase and pay the cost of moving to a new location. Though the need to relocate its printing business within the same general location as its prior location was a bona fide business need, we are of the opinion that the need was insufficient *416 to justify the accumulation of additional earnings during fiscal 1968. No facts were presented at trial with respect to the date petitioner decided to purchase rather than lease quarters for the printing business. No cost estimates for relocating were made.The decision to accumulate was based solely on Mr. Krantz's belief that relocating would cost "a lot" and that accumulations were necessary for petitioner's diversification plan.In fact, the down payment on the Mission Street building to which the printing business was moved was only $50,000. In view of the fact that the purchase of quarters for the printing business required only a cash outlay of $50,000, we hold that the accumulation of earnings for the benefit of the printing business during 1968 was not justified. Petitioner had outstanding a long-term debt of about $140,000 during the fiscal years 1969, 1970 and 1971. However, petitioner did not assert a desire or intent to repay this debt as a business need either in his section 534 (c) statement, at trial, or on brief, and has made no claim that any portion of the accumulation was intended, or was to be applied, for that purpose. Solely because petitioner has not *417 argued the point, we need not consider it here. This opinion, therefore, should not be read as weakening the Court's position that a corporate taxpayer, if it chooses, may legitimately apply or set aside profits to repay debts and need not pay dividends out of borrowed money. Gazette Telegraph Co.,19 T.C. 692, 706-707 (1953), affd. 209 F. 2d 926 (10th Cir. 1954).See also Myron's Ballroom v. United States, F. 2d (9th Cir. Jan. 10, 1977), revg. and remanding 382 F. Supp. 582 (C.D. Cal. 1974). Petitioner next contends that it needed to accumulate its earnings for all the years in issue (fiscal years ending September 30, 1968, 1969, 1970 and 1971) because it planned to enter into the real estate business, and actually did commence such a business with the acquisition on July 1, 1969 of the building into which the printing business moved. The purchase of the Mission Street building arose by virtue of petitioner's need to house its printing business. The incidental rental of a portion of that building did not place petitioner into the active real estate business. Cf. Rafferty v. Commissioner,452 F. 2d 767, 772 (1st Cir. 1971), *418 affg. 55 T.C. 490 (1970). Though three-fourths of the usable space of the building was rented, petitioner retained the most desirable floor for its printing business. It leased the remainder on a long-term basis to the tenant who had been leasing the entire building at the time petitioner purchased the building. Petitioner was only required to maintain the exterior of the building, the roof and water pipes. In view of the limited activity involved, we hold that rental of a portion of the building which housed its printing business did not place petitioner in the active real estate business. As for petitioner's plan during all the years in issue to diversify by entering into the real estate business, we find the plan insufficiently specific and definite to justify accumulation of earnings during the years in issue. Moreover, Mr. Krantz's activities in pursuit of these plans do not convince us that petitioner had the specific intent to go into the active business of operating real estate. Rather Mr. Krantz seemed to be investigating various types of passive and active real estate investments, and the first convicing evidence that petitioner had formed a firm plan *419 to enter into an active real estate business came after the years in issue and after petitioner became aware that its returns were being audited to determine whether it had unreasonably accumulated earnings to avoid income tax with respect to its sole shareholder, Mr. Krantz.
Generally, to justify accumulations for the reasonably anticipated needs of an existing business there must be an indication that the needs of the business require such an accumulation, and the corporation must have specific, definite, and feasible plans for the use of such accumulations. Section 1.537-1(b) (1), Income Tax Regs. Where the accumulations are for the reasonably anticipated needs of new lines of business, there must not only be a specific, definite, and feasible plan of diversification, but the proposed new line of business must also be an active trade or business. Atlantic Commerce & Shipping Co. v. Commissioner,500 F. 2d 937 (2nd Cir. 1974), affg. a Memorandum Opinion of this Court; Sandy Estate Co.,43 T.C. 361, 375-377 (1964); Section 1.533-1(a)(2)(ii) and section 1.537-2(c)(4), Income Tax Regs.; cf. Section 1.355-1(c), Income Tax Regs.
Petitioner's diversification *420 plan fails to meet these criteria for any of the years in issue, and, as a result, the accumulations were not justified by petitioner's real estate diversification plan. Petitioner's plan was not sufficiently definite and specific to justify the accumulation of earnings during the years in issue. The plan called for the acquisition of commercial real estate in the San Francisco area at some indefinite time in the future. The plan failed to delineate with any specificity the type of real estate investment contemplated, the scope of the plan, or the estimated cost of the plan. Such a vague and general plan would nonetheless justify the accumulation of earnings, if petitioner had undertaken clear action in furtherance of the plan. Cheyenne Newspapers, Inc. v. Commissioner,494 F. 2d 429, 433-434 (10th Cir. 1974), affg. a Memorandum Opinion of this Court; Oklahoma Press Publishing Co. v. United States,437 F. 2d 1275, 1277-1278 (10th Cir. 1971). Petitioner asserts that its investigation of potential properties and offers made on some properties represent the necessary clear action which enables its plan to meet the requirements of specificity, *421 definitiveness and feasibility. See section 1.537-1 (b), Income Tax Regs.
We conclude that petitioner's actions did not provide the missing elements of definitiveness or specificity. Petitioner investigated both passive and active investments in commercial, industrial, and residential real estate in and around the entire San Francisco Bay area and beyond. Petitioner's plan was merely to begin looking for and exploring any real estate opportunity which came along and to continue to do so until such time as a suitable and acceptable investment was located. In addition, petitioner has failed to prove that it planned to diversify into an active business during the years in issue. On the contrary, many of the properties petitioner investigated were subject to longterm net leases which required minimal activity for the production of income. These contemplated purchases represented essentially passive investments in real estate unrelated to petitioner's printing business. See section 1.537-2(c)(4), Income Tax Regs.
In July 1972, after the years in issue, petitioner finally purchased an office building, Park Plaza, in Fremont, California, paying $250,000 down. This purchase took *422 place after petitioner's officers had been made aware of respondent's audit to determine whether petitioner was liable for taxes under section 531. When petitioner felt a need for prompt action (the acquisition of the Mission Street building to house the printing business and the need for a positive commitment after audit commenced), it could act promptly.We are not impressed with the vigor of its "search" from 1965 to 1972 for an opportunity to diversify into real estate. No additional accumulations of earnings during the years in issue were justified or reasonable under the circumstances. Finally we conclude that petitioner was formed or availed of for the purpose of avoiding the income tax with respect to its shareholders by permitting its earnings to accumulate instead of being distributed. The accumulations were beyond the reasonable needs of petitioner's business. Petitioner held the bulk of its accumulations in cash and securities. Petitioner has never paid a dividend, and the failure to do so has worked an income tax saving for petitioner's sole shareholder, Mr. Krantz. Under the circumstances, petitioner is liable for the tax imposed under section 531 for all years *423 in issue. Decision will be entered for the respondent. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect during the years in issue.↩
3. Mr. Krantz filed joint returns, and for 1971 elected income averaging.↩
4. These amounts represent petitioner's cost basis in the securities; no evidence was presented on the fair market value of these items. ↩
5. Ibid. ↩
6. Petitioner's mortgage and note payable obligations arose on July 1, 1969, with the purchase of the Mission Street property.↩
7. This amount was listed as mortgages, notes, bonds payable in less than one year on petitioner's tax returns for its fiscal years ending September 30, 1969 and 1970, but was reclassified as a long-term liability on petitioner's tax return for its fiscal year ending September 30, 1971.↩
7. The parties did not request a ruling prior to trial on whether the burden of proof was shifted to respondent.↩